## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| Caliber Home Loans, Inc., | |
| Plaintiff, | |
| | Civil Action No. |
| vs. | |
| Sagent M&C, LLC, | **JURY TRIAL DEMANDED** |
| Defendant. | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Caliber Home Loans, Inc. ("Caliber" or "Plaintiff") brings this action against Sagent M&C, LLC ("Defendant" or "Sagent") and alleges as follows:

### I.     PRELIMINARY STATEMENT

1.      Caliber brings this lawsuit to prevent its contractual counterparty—Sagent—from using extortionate tactics in violation of federal and state law to force Caliber to sign a punitive agreement.  When Caliber refused to be held up, Sagent has threatened to hold Caliber's data hostage, causing massive and irreparable damage to Caliber's business and relationships, as well as to hundreds of thousands of mortgage borrowers across the country.   Caliber does not use the word extortion lightly, but when the facts are understood by the Court, it will be clear that they rise to that level of misconduct in violation of federal and state law.

2.      Caliber is a nationwide mortgage originator and servicer.  As a servicer, it handles the administrative functions of servicing a loan—for example, collecting payments from borrowers, arranging for the payment of homeowners' insurance and property taxes out of escrow funds, and remitting payments to the owners of the loan (sometimes called "investors").  Because of the volume and complexity of the transactions they handle, mortgage servicing companies like Caliber use loan processing platforms—essentially, a technological system that keeps track of loan

information and processes updates (such as payments, defaults, or payoffs) throughout the life of the loan.  Sagent offers a loan processing platform called "Loanserv" and has provided Caliber with this service for the past twelve years.

3.      One key feature of the platform is to provide the mechanics for borrowers to request forbearance and for that request to be evaluated by Caliber consistent with federal law.  Given the current economic crises and the large volume of loans in forbearance or that are requesting forbearance, access to Caliber's data through Sagent's platform is of paramount importance to both Caliber and its many borrowers dealing with forbearance issues.

4.      Sagent has described the loan processing platform and related tools as "the lifeblood of customer care, retention and engagement."  They are critical to a mortgage servicing company's operation and performance (not to mention compliance with a host of federal and state laws and regulations).  Perhaps most importantly, that lifeblood service cannot be transferred quickly and easily to another provider.  Thus, if Caliber ever sought to switch platforms, it would necessarily depend upon Sagent's cooperation and good faith to effectuate that transfer.

5.      Sagent's performance under the contract has deteriorated significantly, which has forced Caliber to seek alternatives.  Once Sagent learned that Caliber was seeking to switch platforms, Sagent enacted a series of maneuvers designed to make it impossible for Caliber to move.  In May 2020, the parties entered into an amendment of their agreement, which would have obligated Sagent to provide services for one additional year beginning February 1, 2021 through January 31, 2022.  Nonetheless, Sagent has stated that it believes the parties' amendment to be void and that it has no obligation to provide Caliber services past January 31, 2021, unless the parties enter into a new agreement.  While Sagent has continued to provide services as of the date of this filing, it maintains that it has no obligation to do so.

6. Worse, Sagent has refused to facilitate an orderly transition of information from Sagent unless Caliber pays it a king's ransom (the last demand was tens of millions of dollars, multiples of the annual fees under the existing contract). Leaving Caliber with no meaningful option to transfer service to another platform, Sagent is using its hold on Caliber's lifeblood data to demand extortionate terms—a contract with a longer term than the parties have ever agreed to (7 years vs. the 3-year or 5-year extensions that the parties have worked under in the past), with prices nearly twice as high, and with no meaningful way for Caliber to transition services from Sagent in the event that Sagent does not perform under the contract or if Caliber seeks to use a different platform provider at the end of the term. Sagent has threatened to effectively destroy Caliber's entire business and its relationships with agencies—the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac"), which collectively own the vast majority of residential mortgages originated in the United States— if Caliber does not agree to the extortion. Sagent's actions and threats have necessitated immediate action in this Court.

## II.    THE PARTIES

7. Caliber is a leading nationwide mortgage originator and servicer, organized as a Delaware corporation with its principal place of business at 1525 S Belt Line Rd., Coppell, Texas 75019.

8. Sagent is a Delaware limited liability company with its principal place of business at 1000 Continental Drive, Suite 500, King of Prussia, Pennsylvania 19406. Summons may be served by and through its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

### III.    JURISDICTION AND VENUE

9.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question), as this action arises under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030.  This Court has ancillary jurisdiction over the state law claims under 28 U.S.C. § 2201.

10.    Venue is proper in this District under, *inter alia*, the provisions of 28 U.S.C. § 1391, because, upon information and belief, a substantial part of the events giving rise to this complaint occurred in this District, including but not limited to oral and written communications from Sagent to Caliber threatening to cut off all services and leave Caliber's loans unserviced.  In addition, the injuries to Caliber described herein occurred primarily within this District and affect both its customers and competitors nationwide.

### IV.    INTERSTATE COMMERCE

11.    The acts complained of herein have occurred within the stream of and have substantially affected interstate trade and commerce.

### V.    FACTUAL ALLEGATIONS

#### A.    *History of the Parties' Relationship*

12.    On August 14, 2008, Caliber's and Sagent's predecessors in interest entered into a Master Services Agreement ("MSA") for the design, implementation, and use of Loanserv[1] in Caliber's servicing of loans and other work relating to the platform.  Since 2008, the parties have agreed to multiple amendments to the MSA, including various extensions more fully described below.   Caliber currently services over 660,000 active borrower/residential loans and approximately 500,000 inactive loan accounts using Loanserv.

---

[1] The system was originally referred to as the Fiserv System, but the name has since been changed to the Loanserv System.

13.     Under the MSA, Caliber provided information about the loans it services—such as borrower names, loan amounts, and so on—to Sagent for loading into the Sagent platform. Sagent's systems would then process the various transactions that take place with respect to the loans, such as collecting and applying payments.  At all times, however, as expressly agreed by the parties, the borrowers' business and financial information belonged to Caliber, not Sagent.

14.     Because of the importance of having a loan processing platform to carry out loan servicing functions, Caliber contemplated that "deconversion"—put simply, converting or transitioning to a different provider—might be necessary in the future.  For this reason, the parties signed Amendment No. 1 to the MSA agreeing to a price of $1.50 per loan, not to exceed $350,000, for certain Sagent deconversion assistance, should it be required.

15.     The parties also executed Amendment No. 2 to the MSA, requiring Sagent to furnish Caliber with client files in Loanserv's standard format and assist with deconversion if necessary, provided Caliber paid Sagent's deconversion charges.

16.     In 2016, Sagent and Caliber signed Amendment No. 6 to the MSA, extending the termination date of the MSA to January 31, 2021, with an automatic three-year extension unless either party provided a notice of non-renewal at least 180 days prior to January 31, 2021.

17.     On May 22, 2020, Sagent and Caliber agreed to Amendment No. 102, superseding the automatic three-year extension in Amendment No. 6 and extending the termination date of the MSA to January 31, 2022.

18.     By late 2019 and early 2020, Caliber had been unhappy with Sagent's services for some time.  Caliber received files from Sagent six nights a week, which Caliber then used to update other systems.  Sagent was regularly delivering those files late, resulting in Caliber missing update deadlines for other systems, or having to scramble to get them done in time.  These late deliveries

hindered Caliber's ability to properly service its loans and help its borrowers.  Additionally, Sagent's development of Account Connect—the borrower-facing interface that allows borrowers to view information about their mortgage and perform related transactions over the web—was off track, running behind schedule.  Overall, Sagent's poor performance had resulted in several critical "priority 1" incidents.

19.     As a result of these concerns, Caliber began exploring back-ups or alternative options for the loan processing platform and related services that Sagent was providing.  Caliber ultimately decided to move its business to another platform at the conclusion of its agreement with Sagent.

20.     When Sagent learned that Caliber had decided to take its business to a Sagent competitor, Sagent started taking the position that Amendment No. 102, extending the term of the MSA to January 31, 2022, was invalid, and therefore Amendment No. 6's January 31, 2021 termination date controlled.

21.     Caliber disagreed.  As a result of Sagent's position, on July 23, 2020, Caliber served Sagent with a Notice of Default for its anticipatory breach of Amendment No. 102 and demanded that Sagent honor the extended term through January 31, 2022.  Despite the Notice of Default, Sagent continued to absolutely repudiate Amendment No. 102.

22.     In the meantime, Caliber took steps to start transitioning to its new provider.  Transitioning to a new loan processing platform often takes approximately a year or more after execution of a contract.  The amount of work is extraordinary.  Caliber must transfer borrower information from the old platform provider to the new one, re-train employees, install a platform, and do other necessary work to accommodate the transition.  The ongoing pandemic further

complicates transition efforts. And a gap in servicing would be even more detrimental to borrowers now, when they need more help than ever.

23. Based on Sagent's position that Amendment No. 102 was invalid, Caliber began to take the steps it could to begin the transfer process. On August 24, 2020, Caliber requested deconversion services to help with that transition. Under the parties' agreements, Sagent was required to develop a Project Plan for deconversion within 15 business days of receipt of Caliber's request. Moreover, under the MSA, Sagent owes Caliber a duty of good faith and fair dealing in the course of performance.

24. However, Sagent failed to act in good faith and did not develop a Project Plan or provide other deconversion services, despite (1) the need to move forward immediately for Caliber to be able to timely transition to a new platform; (2) the duty to furnish Caliber copies of borrower files (which Caliber undeniably owns); (3) the duty to provide a Project Plan; and (4) the duty to provide such information and assistance as is reasonable and customary to enable Caliber to deconvert from Loanserv.

25. Based on this default, on September 17, 2020, Caliber served a second Notice of Default on Sagent and again requested deconversion assistance. Not only did Sagent refuse in bad faith, but Sagent also took the position that it would not provide Caliber its own borrower data because the information is in a Loanserv copy book format that is confidential and cannot be disclosed to a new platform service provider, even though this information in copy book format was routinely provided to Caliber's new provider in prior conversions with other Sagent clients. Sagent's refusal to provide Caliber its own borrower data was clearly to keep control over Caliber's data as "ransom" or "hostage" to extort Caliber out of more money in bad faith. In so doing,

Sagent exceeded their authorized access to such data, in violation of possession rights, and by means of their conduct demonstrated intent to commit fraud to obtain more money from Caliber.

26.     In light of Sagent's continued intransigence and refusal to provide the deconversion assistance necessary to enable Caliber to transfer to a new service provider—notwithstanding its contractual obligations to do so—Caliber investigated and discovered that it could at least begin the process of data mapping its borrowers' data for conversion without Sagent.  But to complete the transition, Caliber needed Sagent to provide a test region as soon as possible and to transfer all of Caliber's borrowers' complete files in the Loanserv copy book format on the final conversion day.

27.     Yet again, Sagent refused to act in good faith.  Worse yet, Sagent took the position that it had no obligation to provide services after January 31, 2021.  Because Sagent refused to provide Caliber's borrower data to Caliber's new provider, but also threatened to discontinue providing the absolutely critical loan processing platform for those loans, the loans would go unserviced.

28.     Sagent knew it had the power to put Caliber in this impossible position.  After all, it publicly recognized that the type of technology it provides is the "lifeblood" of loan servicing.  By refusing to provide the services it had contractually agreed to provide, unilaterally declaring the contract void, but also refusing to turn over to Caliber the data that would allow it to transition to another services provider, Sagent had Caliber over a barrel.

29.     On January 27, 2021, just five days before Sagent claimed its obligation to provide services ended, Sagent made Caliber an offer.  Sagent would continue providing its services to Caliber and its borrowers, but only if Caliber agreed to sign a new, seven-year agreement, with an 80% price increase, reduced services, and a host of other new provisions favorable to Sagent.

Caliber had to choose between having the "lifeblood" of its servicing business cut off, or signing up for seven more years of Sagent's inferior services at almost double the cost. Worse yet, Sagent's demand included an exclusivity provision prohibiting Caliber from using any of Sagent's competitors' products and making it impossible to transition to a new provider even if Sagent fails to perform. But unless Caliber agreed to Sagent's demands, Sagent would not confirm that it would continue to provide *any* services. While Sagent has continued providing services as of the time of this filing, it continues to take the position that the parties do not have a valid contract in place that would require Sagent to perform any services for Caliber.

**B.     *Regulation of the U.S. Residential Mortgage Servicing Industry and its Technology***

30.     Mortgage servicers like Caliber operate in highly regulated environments in which virtually every aspect of operations, including their use of technology, is carefully monitored. Servicers are subject to multiple banking and consumer financial laws that strictly regulate practice to ensure, among other things, the safety and soundness of their operations, and the protection of the borrowers they serve.

31.     Since 1968, Congress has likewise enacted numerous consumer financial laws. Pertinent here, these laws include the federal Truth in Lending Act (which promotes the informed use of consumer credit by requiring certain disclosures on consumer loans, and which likewise provides other protections), the Fair Credit Reporting Act (which promotes the accuracy, fairness and privacy of consumer information, including consumer credit data), and the Real Estate Settlement Procedures Act (which requires mortgage lenders and servicers to provide borrowers with pertinent and timely disclosures regarding the nature and costs of a real estate settlement process, provides certain requirements regarding escrow accounts, and which likewise regulates numerous other servicing and foreclosure practices).

32.     With the passage of Title X of the Dodd-Frank Act in 2010, Congress established the federal Consumer Financial Protection Bureau ("CFPB"), and granted the new agency expansive authority over consumer protection in the consumer financial sector, including broad supervision and enforcement authority with respect to consumer financial laws such as the laws that govern mortgage lending and servicing.  Today, the CFPB regulates mortgage servicers, such as Caliber, and subjects these entities to both regular and targeted examinations.  The CFPB has likewise promulgated numerous regulations and staff commentary, including mortgage servicing-related standards and requirements that became effective in 2014 (the "Mortgage Servicing Rule"). In performing its role, the CFPB specifically examines regulated entities such as Caliber that engage in mortgage origination and servicing in order to, among other regulatory goals, "assess the quality of the regulated entity's compliance risk management systems, including internal controls and policies and procedures, for preventing violations of Federal consumer financial law in its mortgage servicing business."  *See* CFPB Supervision and Examination Manual (August 2019 update), at Procedures page 2.

33.     In addition to the aforementioned federal regulators, numerous other federal agencies have supervisory and examination authority with respect to mortgage loans made under their authority.  For example, the U.S. Department of Housing and Urban Development ("HUD") approves and examines mortgage lenders and servicers who make mortgage loans that are insured by HUD's Federal Housing Administration ("FHA loans").  The FHA does not itself make mortgage loans but rather insures FHA loans made by private lenders.  Similarly, the U.S. Department of Veterans Affairs ("the VA") guarantees private mortgage loans made to veterans and their families ("VA loans").  Also similar are the programs offered by the U.S. Department of

Agriculture ("USDA"), which guarantees mortgage loans made by private lenders to rural consumers ("USDA loans").

34.     FHA loans, VA loans and USDA loans are subject to purchase and securitization by the Government National Mortgage Association, better known as "Ginnie Mae," and which operates an agency within HUD.  Along with HUD, the VA, and the USDA, Ginnie Mae regularly examines mortgage lenders and servicers for compliance with federal and state law.  It likewise issues detailed investor reporting requirements for covered loans.

35.     State financial regulators additionally play a significant role in the regulation of non-bank residential mortgage servicers.  To operate in state jurisdictions, mortgage servicers are generally licensed and examined not just by their home state regulator, but also by state regulators in each of the jurisdictions in which they operate.  For Caliber, that means it is licensed and regulated by state financial regulators throughout the United States.

36.     Mortgage originators and servicers like Caliber are largely subject to and must keep well informed on the varying laws of each of the states in which they operate.  For a nationwide mortgage lender and servicer like Caliber, that means ensuring it complies with the myriad requirements of every state plus the District of Columbia, as well as the many local ordinances that may impact homeowners and servicers at the default servicing stage and later.  These obligations may include requirements for making separate consumer disclosures, prohibitions against certain actions or contract terms, counseling obligations, and regulations that require post-default maintenance and registration of vacant or abandoned properties, among many other requirements.

37.     Mortgage servicers are likewise subject to detailed reporting obligations, as well as examination, by investors, that is, the entities that actually own the loans that are being serviced.

In addition to Ginnie Mae, the other significant governmental investors are Fannie Mae and Freddie Mac, which collectively own the vast majority of residential mortgages originated in the United States.  Ginnie Mae, Fannie Mae and Freddie Mac have detailed requirements for approval of mortgage lenders and servicers, and have established and regularly enforce numerous servicing requirements, including with respect to reporting and technology.

38.     Finally, to the extent mortgage servicers perform servicing on behalf of federal or state-chartered banks, such servicers are subject to examination by federal banking regulators under procedures designed to ensure proper vendor practices.

39.     Each of these federal and state regulators is keenly aware of the significant role of technology in supporting the mortgage servicing function.  Ginnie Mae, Fannie Mae and Freddie Mac each impose strict technology testing and due diligence requirements due to the regular interface with these investors, and between servicers and consumers.  For example, Freddie Mac requires servicers to "confirm that the firm has adequate technology in place or technological capabilities to provide reporting, communication and tracking of key events and milestones . . ."  *See* Freddie Mac Single-Family Seller/Servicer Guide, § 9501.3(q) (effective November 15, 2017).  Freddie Mac further provides detailed specifications for lender platform requirements.  *Id.* § 2402.1.   Likewise, Freddie Mac requires various other specific technology requirements, including that systems have adequate encryption to protect consumer data.  *Id.* § 1402.6.

40.     Regulators also focus on any actual or proposed changes in software systems.  For example, the CFPB will "determine whether the financial institution's internal controls are adequate to ensure compliance in the area under review," and will "review the procedures used to ensure compliance when changes occur (e.g., changes in … software programs)."  *See* CFPB Examination Manual, Interagency Examination Procedures, Truth in Lending Act, at Procedures

2 (March 2019 update) (emphasis added).  Likewise, the CFPB will closely scrutinize a regulated entity to ensure that it has conducted appropriate testing of the software it develops or purchases. *Id.*, UDAAP, Procedures 2 (October 2012 update).

### C.    Sagent's Extortion

41.    When Caliber told Sagent that it intended to transition to a different service provider, Sagent took action to impede and delay the transition, until it could successfully put Caliber in a situation in which Caliber had no choice but to accept whatever demands Sagent wanted to make.  Put simply, Sagent wanted to be able to make Caliber an offer that it could not refuse.

42.    Sagent's delay tactics were successful.  It slowed down the transition enough that it ran out the clock on the MSA (which Sagent had unilaterally cut short by its repudiation of Amendment No. 102).  Because Sagent refused to provide the deconversion assistance required by the MSA, Caliber did not have time to complete the transition before Sagent deemed the MSA terminated on January 31, 2021.  Sagent is the only service provider that currently has possession of Caliber's borrower files and data, so it is the only company that can provide the "lifeblood" services to Caliber.

43.    Sagent used that leverage—which it had acquired improperly, by refusing to provide deconversion assistance—to attempt to coerce Caliber to sign a new, long-term agreement at nearly double the price.  The terms and conditions that Sagent presented to Caliber were unconscionable and anti-competitive.

44.    When Caliber proposed a compromise, such as a temporary agreement to provide services at Sagent's usual and customary rates, or a reversion to Amendment No. 6 (a three-year renewal using the previously agreed terms and conditions), Sagent refused.

45.     Furthermore, Sagent's repudiation of Amendment No. 102 was retaliatory, an attempt to punish Caliber for daring to transition to a Sagent competitor.  Through its ensuing conduct, Sagent also failed and refused to participate in good faith negotiations concerning the transition away from Sagent.  As a direct result of these actions, Sagent forced Caliber to incur additional expenses to accomplish as much of the transition process as possible without Sagent's help.

46.     In light of Sagent's refusal to deal in good faith with Caliber unless Caliber accedes to Sagent's unconscionable demands, Sagent should be ordered to specifically perform its contractual obligations to Caliber and is liable for Caliber's damages.

## COUNT ONE

### Violations of the Computer Fraud and Abuse Act (18 U.S.C. § 1030, *et seq.*)

47.     Caliber realleges and incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

48.     18 U.S.C. § 1030(a)(7) of the Computer Fraud and Abuse Act provides as follows:

(a) Whoever –

****

(7) with intent to extort from any person any money or other thing of value, transmits in interstate or foreign commerce any communication containing any—
(A) threat to cause damage to a protected computer;
(B) threat to obtain information from a protected computer without authorization or in excess of authorization or to impair the confidentiality of information obtained from a protected computer without authorization or by exceeding authorized access; or
(C) demand or request for money or other thing of value in relation to damage to a protected computer, where such damage was caused to facilitate the extortion;
Shall be punished as provided in subsection (c) of this section.

49.     In addition to criminal penalties, "[a]ny person who suffers damage or loss by reason of a violation of [18 U.S.C. § 1030] may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief."  18 U.S.C. § 1030(g).

50.     Caliber services loans nationwide such that the computers used by Caliber are protected computers used in interstate commerce under 18 U.S.C. § 1030.

51.     Sagent provides loan processing platforms used nationwide, to service loans nationwide, such that computers used by Sagent are protected computers used in interstate commerce under 18 U.S.C. § 1030.

52.     With the intent of extorting Caliber, Sagent transmitted in interstate commerce a communication from a protected computer containing a threat to damage protected computers by threatening to remove Caliber's access to Loanserv and by disabling Caliber's access to its borrower data stored within Loanserv.

53.     Sagent is not authorized to disable Caliber's access to Loanserv and Caliber's borrowers' data contained within it.

54.     Nevertheless, Sagent has threatened to disable Caliber's access to Loanserv and Caliber's borrowers' data contained within it.

55.     Sagent has violated Section 1030(a)(7) of the Computer Fraud and Abuse Act by transmitting a communication with an impossible ultimatum: Caliber must either agree to Sagent's demands and sign a new, long-term contract, with an 80% price increase and fewer services, or Sagent will bring Caliber's loan servicing business to a crash landing, removing Caliber's access to the loan processing platform and borrower data necessary to conduct Caliber's business.

56.     Sagent's demand constitutes extortion under the Computer Fraud and Abuse Act.

57.     Caliber will be irreparably harmed by Sagent's actions as it will be unable to satisfy its loan servicing obligations required by contract and by federal and state laws and regulations. Its borrowers' loans will go unserviced until Sagent releases Caliber's borrower data (which it has

so far refused to do) and Caliber can complete the expensive, time-consuming task of transitioning to a different loan processing platform.

58.     Sagent's actions will also cause Caliber losses of at least $5,000 in value, including, for example, damages caused by interruption in Caliber's servicing business, loss of goodwill and reputation, and the costs of restoring data and transitioning it to an alternative platform.  Moreover, because the conduct was engaged in intentionally, maliciously, and with wanton disregard for its rights and interest, Caliber seeks an award of exemplary damages.

## COUNT TWO

### Breach of Contract

59.     Caliber realleges and incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

60.     The MSA, including each of its amendments, is a valid contract supported by consideration.  Caliber has fully complied with and performed under the MSA.

61.     Sagent has breached the MSA by failing to perform its obligations.

62.     Caliber has suffered damages as a result.

63.     Caliber is entitled to damages and an order compelling Sagent to specifically perform under the MSA and its amendments.

64.

65.     Plaintiff further seeks its costs and reasonable attorneys' fees pursuant to the MSA.

66.     All conditions precedent to Plaintiffs' recovery in this action have occurred or been performed.

## COUNT THREE

### Declaratory Judgment—Validity and Enforceability of MSA and its Amendments

67.    Caliber realleges and incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

68.    The MSA, including each of its amendments, is a valid contract supported by consideration.  Caliber has fully complied with and performed under the MSA.

69.    The MSA, including its amendments, is fair and is free from misrepresentation, misapprehension, fraud, mistake, or surprise.

70.    Sagent has denied the validity and enforceability of the MSA, including its amendments.

71.    There exists an actual controversy between the parties as to the validity and enforceability of the MSA, including its amendments. That controversy is ripe for resolution, and a declaratory judgment from this Court would resolve the dispute.

72.    Accordingly, Caliber seeks a judgment that Caliber has complied with the MSA, including its amendments, and that the MSA and its amendments is valid and enforceable.

## COUNT FOUR

### Theft

73.    Caliber realleges and incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

74.    At all times through the present, Caliber has had a possessory right to its borrower data, including but not limited to in the Loanserv copy book format, which data Sagent has misused and has refused to return.

75.     Sagent's exercise of control over those assets was outside of Sagent's authority because they had no business purpose and were done to unjustly enrich Sagent, at the expense of Caliber.  Sagent's exercise of control over such borrower data from Caliber likewise constitutes theft.

76.     Sagent intended to deprive Caliber of its property.  Caliber has demanded the return of such borrower data in the Loanserv copy book format, including through written correspondence prior to filing this lawsuit.  Nonetheless, Sagent has refused to return to Caliber this data.

77.     Caliber has been damaged by Sagent's failure to return its property and has further been forced to spend time and resources in an attempt to recoup these losses.

78.     Sagent's actions constitute theft.

79.     In addition, Caliber is entitled to recover exemplary damages.

80.     Caliber is also entitled to recover reasonable and necessary attorneys' fees on this cause of action.

81.     Accordingly, Caliber demands that Sagent pay (1) all actual and consequential damages caused by its theft of Caliber's property, (2) statutory damages, (3) exemplary damages in an amount the Court deems appropriate, and (4) all reasonable and necessary attorneys' fees and costs of suit.

## COUNT FIVE

### Conversion

82.     Caliber realleges and incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

83.     Sagent converted Caliber's property, including, without limitation, Caliber's borrower data and Caliber's loan data.

84.     Sagent is wrongfully exercising dominion and control over Caliber's borrower information by using it in a way that departed from the conditions under which it was received. Specifically, Sagent is refusing to return such property until Caliber agrees to a new, long term and lucrative contract, despite Caliber's demand that Sagent return Caliber's property.

85.     Sagent's wrongful acts proximately caused injury, and will continue to cause injury, to Caliber resulting in damages, including, but not limited to, loss of property.

86.     Caliber accordingly sues Sagent for conversion.

## COUNT SIX

### Unfair Competition

87.     Caliber incorporates, by reference, all preceding paragraphs as if fully set forth herein.

88.     While state law protects and encourages competition between businesses, that competition must be fair and must not run contrary to accepted business ethics.

89.     Sagent has engaged in unfair competition.  It is using its possession of Caliber's data to prevent Caliber from moving its business to a competitor, and it is threatening to withhold services if Caliber does not agree to Sagent's demands.

90.     As described in the preceding paragraphs, Sagent has engaged in wrongful and tortious conduct.

91.     Sagent's wrongful acts proximately caused Caliber injury.

92.     Caliber accordingly sues Sagent for unfair competition.

## COUNT SEVEN

### Negligence Per Se

93.     Caliber incorporates, by reference, all preceding paragraphs as if fully set forth herein.

94.    Sagent's conduct will result in the violation of Federal laws and regulations by, inter alia, causing Caliber's borrowers' loans to go un-serviced.

95.    Caliber and its borrowers are within the class which the Federal laws and regulations were designed to protect.

96.    Sagent's acts or omissions have proximately caused injury to Caliber, resulting in actual damages.

97.    Caliber accordingly hereby sues Sagent for negligence per se.

## VI.    DEMAND FOR JURY TRIAL

98.    Caliber demands a jury trial pursuant to Federal Rule of Civil Procedure 38.

## VII.    REQUEST FOR RELIEF

WHEREFORE, Caliber requests that the Court award or grant the following:

A.    Actual damages;

B.    Pre- and post-judgment interest in the maximum amount allowed by law;

C.    Specific performance of the parties' agreements;

D.    Declaratory judgment that the MSA, including its amendments, is valid and enforceable;

E.    Injunctive relief as specified herein;

F.    Reasonable and necessary attorneys' fees and expenses;

G.    Costs of court;

H.    Exemplary damages; and

I.    Such other and further relief to which Caliber may be justly entitled.

Dated:  February 3, 2021                    By:   /s/ Angela C. Zambrano

                                                  Angela C. Zambrano
                                                  State Bar No. 24003157
                                                  angela.zambrano@sidley.com
                                                  Robert Velevis
                                                  State Bar No. 24047032
                                                  rvelevis@sidley.com
                                                  Chelsea A. Priest
                                                  State Bar No. 24102375
                                                  cpriest@sidley.com
                                                  SIDLEY AUSTIN LLP
                                                  2021 McKinney Avenue, Suite 2000
                                                  Dallas, Texas 75201
                                                  Telephone: (214) 981-3300
                                                  Facsimile: (214) 981-3400